McCORKLE FARMS, INC. *v.* Gene THOMPSON

CA 01-1405 84 S.W.3d 884

Court of Appeals of Arkansas
Division III
Opinion delivered September 18, 2002

*Fogleman & Rogers*, by: *Joe M. Rogers*, for appellant.

*Butler, Hickey, Long & Harris*, by: *Andrea Brock*, for appellee.

ANDREE LAYTON ROAF, Judge. This is a crop-damage case. Appellant, McCorkle Farms, Inc., filed suit

against Delta Farms Elevator, Inc., Delta's president and sole shareholder, appellee Gene Thompson, and Randy Atkison d/b/a Buffalo Island Flying Service[1] after noticing symptoms consistent with its cotton crop being exposed to the pesticide 2,4-D. Shortly before these symptoms were noticed, Atkison had been retained by Thompson to apply 2,4-D to his nearby rice crop. After trial, the jury returned a verdict finding no negligence on the part of either Atkison or Thompson. This appeal followed. McCorkle Farms raises four points on appeal: (1) the trial court erred in allowing introduction of the Plant Board Pesticide Committee's conclusion that there was insufficient evidence that Atkison was responsible for the 2,4-D damage to crops on several nearby farms, including appellant's; (2) the trial court erred in refusing to instruct the jury that violation of Plant Board regulations concerning the restricted use of 2,4-D was evidence of negligence; (3) the trial court erred in refusing to instruct the jury that when an independent contractor is engaged to perform inherently dangerous work any negligent conduct of the contractor in the performance of that work is chargeable to the employer; (4) the trial court erred in allowing Thompson to introduce statistical evidence of average per-acre yields for a ten-year period in support of his contention that McCorkle Farms did not suffer a reduction in its yield as a result of 2,4-D exposure. We reverse on all four points and remand.

Joey McCorkle, one of McCorkle Farms' officers, testified that in 1992 it had 472 acres planted in cotton and that the crop had a good start. He testified that he noticed symptoms — elongated leaves and funny-looking bolls — associated with exposure to 2,4-D on July 7, 1992. The symptoms were reported to its crop consultant and to the Plant Board. McCorkle testified that he met with Keith Houchin and Lonnie Smith, investigators from the Plant Board. McCorkle also testified that he was not present at

---

[1] Atkison died on August 27, 1997, the claim against his estate was compromised, and the estate was dismissed from the suit. Atkison remained a party for the limited purpose of allowing the jury to allocate fault to Atkison. The same order dismissed Delta from the case.

the Plant Board hearing. He also noted that the heaviest 2,4-D damage was located on the south and southeast side of the farm. Records showed the farm's average yield for 1992 to be 618 pounds per acre, compared with an anticipated yield of 900 pounds per acres.

Keith Houchin, an agricultural specialist with the Arkansas State Plant Board, testified that he was assigned with investigator Lonnie Smith to investigate a 2,4-D complaint filed by McCorkle Farms. Houchin stated that he and Smith made an evaluation of the entire area and determined that McCorkle Farms' exposure was a result of a drift as opposed to a direct application because the symptomology was not uniform. He also stated that the symptoms appeared heaviest on the southeast corner of the McCorkle Farms acreage and lighter toward the northwest corner. Houchin testified that he determined that the source of the 2,4-D exposure was the aerial application made on Thompson's farm by Randy Atkison.

Houchin explained that State Plant Board regulations require aerial applicators to file a report with the board within five days of an application. He testified that Atkison's reports indicated that he applied 2,4-D for Thompson on July 4, 1992, and on July 7, 1992. Houchin testified that the regulations prohibit application of 2,4-D if the wind velocity is in excess of five miles per hour or the temperature is in excess of ninety degrees. Houchin further testified that he compared Atkison's report with official weather reports from Jonesboro and Memphis and that he concluded that Atkison's applications on both days were made outside the conditions set out in the regulations.

On cross-examination, Houchin testified from a transcript of the Plant Board Pesticide Committee hearing in which the board concluded that there was not sufficient evidence to show that Atkison was responsible for the damages outlined in the complaints received by the board. Houchin stated that he was not sure to which complaint the vote pertained, but McCorkle Farms had made a complaint covered by the hearing.

Avril Brown, who farmed the subject land between 1962 and 1990, testified that in 1992, he farmed cotton on four tracts of land near McCorkle Farms' acreage. He testified that he thought McCorkle Farms had a beautiful crop growing until he noticed damage to the crop after July 4. Brown testified that he considered his tracts of land to be comparable and testified as to his yield in 1992, which was 966 pounds per acre. Brown also testified that when he farmed the McCorkle Farms acreage, he would average between 850 and 1,000 pounds per acre in a good year and between 500 and 600 pounds per acre in a poor year. He also testified that he did not notice any significant difference between his crop and McCorkle Farms' prior to the damage. Brown testified that there would not be a significant difference in the cost of picking the crop, whether it was a 500-pound per acre crop of a 1,000-pound per acre crop. Gene Thompson testified that he had been farming since 1948. He testified that in 1992 he, individually or in partnership, farmed 12,000 acres of rice located south and east of McCorkle Farms' land. He testified that he was aware that there was risk in using 2,4-D and that one had to be very careful in using the pesticide. He also testified that he knew the Plant Board closely regulated 2,4-D because of its susceptibility to drift. Thompson testified that he contacted Atkison about applying 2,4-D to his rice crop and specified the time frame within which to do so. Thompson admitted that he did not give Atkison any other instructions, warnings, or cautions, that he did not check the 2,4-D label containing instructions and precautions, and that he did not check Atkison's plane to ensure that it complied with the regulations. Thompson testified that he was aware that the Plant Board regulations held him, as owner, responsible. Thompson said he was present when Atkison made both applications.

Thompson testified that he was aware that the Plant Board regulations prohibited a landowner from allowing 2,4-D to be applied without complying with the regulations. He also admitted that there was no gauge in the field to determine wind speed and that he did not check the wind speed or the other requirements of the regulations. He further testified that Atkison's report

stated that the wind was from the south during the July 4th application, but that he disagreed with the report because the winds were out of the west and southwest at the time. Thompson also testified that he obtained documents from the ASCS and the Extension Office concerning the average cotton production yield for Cross County between 1982 and 1992. Over objection, Thompson testified as to the averages contained in those documents.

██ ██ McCorkle Farms' first point is that the trial court erred in allowing the introduction of the conclusions of the Plant Board Pesticide Committee that there was insufficient evidence presented to the board that Atkison was responsible for 2,4-D exposure that resulted in some seventeen complaints to the board. The decision whether to admit relevant evidence rests in the sound discretion of the trial court, and our standard of review of such a decision is whether the trial court has abused its discretion. *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Marts v. State*, 332 Ark. 628, 968 S.W.2d 41 (1998). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401. Our courts have repeatedly held, however, that a trial judge may exclude evidence, although relevant, if its probative value is *substantially* outweighed by the danger of unfair prejudice. Ark. R. Evid. 403; *Nationsbank, N.A. v. Murray Guard, Inc.*, 343 Ark. 437, 36 S.W.3d 291 (2001); *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999); *Lewis v. State*, 73 Ark. App. 417, 44 S.W.3d 759 (2001). All evidence is presumably prejudicial, or it would not be relevant; but Rule 403 only excludes evidence that is *unfairly* prejudicial. *Lindsey v. State*, 319 Ark. 132, 890 S.W.2d 584 (1994); *Marvel v. Parker*, 317 Ark. 232, 878 S.W.2d 364 (1994). Rule 403 involves balancing, on the one side, the evidence's probative value and, on the other side, the evidence's dangers, including its unfairly prejudicial and misleading nature.

██ In *Berry v. State*, 290 Ark. 223, 233, 718 S.W.2d 447, 453 (1986), the Arkansas Supreme Court found a good definition

of "unfair prejudice" in the advisory committee's commentary to Fed. R. Evid. 403, which describes it as an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." We agree that use of the conclusion of the Plant Board report meets this definition.

■ ■ At common law, a judgment from another case would not be admitted. *Nipper v. Snipes*, 7 F.3d 415 (4th Cir. 1993); *United States Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275 (11th Cir. 2001); *United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994). *Cf. Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir. 1987), *cert. denied*, 484 U.S. 1043 (1988). A practical reason for denying a judgment or administrative agency report evidentiary effect is the difficulty of weighing a judgment or report, considered as evidence, against whatever contrary evidence a party to the current suit might want to present. The difficulty must be especially great for a jury, which is apt to give exaggerated weight to an official finding of a state body. *Nipper, supra*; *Tieco, supra*; *United States v. Jones, supra*. The jury, not the Plant Board, was charged with making factual findings on McCorkle Farms' allegations in this case. By having the Plant Board's report in evidence, the jury was placed in a position of being forced to either reach a conclusion different from that reached by an official agency of the State of Arkansas or to adopt that same conclusion, despite believing that the evidence actually supported a different conclusion because it *was* made by an official agency. *See, e.g., Gramling v. Jennings*, 274 Ark. 346, 625 S.W.2d 463 (1981) (medical malpractice case reversed because a doctor was allowed to state that, in his opinion, another doctor was not negligent when the opinion told the jury which result to reach). The use of the Plant Board's report to cross-examine its own investigator about the Board's conclusion was an attempt to tell the jury which result to reach. The report was not about the witness's credibility, as argued by Thompson to the trial court, because the report did not call into question the witness's *investigation methods and facts found*; rather, it called into question the witness's conclusions as to what those facts meant after the investigation was completed. This prejudice is borne out by Thompson's argument to the jury that because the Plant Board

found Atkison not responsible, why, then, was it necessary for the present case to be tried.

Nipper and Tieco also analyzed the admission of such records under Rule 403 and found that the prejudicial effect of the records outweighed any probative value the records might have had. *Nipper*, *Tieco*, and *Jones*, all excluded judicial findings of fact from other cases as not coming within the public records exception to the hearsay rule found in Fed. R. Evid. 803(8). Thompson argues that *Nipper* is not on point because Federal Rule of Evidence 803(8) applies to judgments, and the Plant Board's conclusion is not a judgment. This is a distinction without a difference because the Plant Board's decision is the highest level of administrative decision-making that could be had in the case. Certainly, Atkison could not be expected to appeal a decision that exonerated him. In *First National Bank v. Hess*, 23 Ark. App. 129, 743 S.W.2d 825 (1988), this court affirmed the trial judge's exclusion of an order from a United States Bankruptcy Court regarding the bank's interest in property that was the subject of the suit before the court. This court held that, because notice was the issue and the date of the bankruptcy court's order had been discussed, the order itself did not need to be admitted because its probative force would be outweighed by its prejudicial effect of confusing the issues.

■ The Plant Board report resulted from a "special investigation of a particular complaint" and is not excepted from the hearsay rule. Ark. R. Evid. 803(8)(iv); *Swart v. Town & Country Home Center*, 2 Ark. App. 211, 619 S.W.2d 680 (1981); *Wallin v. Insurance Co. of N. Am.*, 268 Ark. 847, 596 S.W.2d 716 (Ark. App. 1980). In addition, it is only the "factual findings" resulting from an investigation that come within the hearsay exception of Rule 803(8). *Swart, supra.*

■ Thompson also argues that because the Plant Board is an administrative agency authorized to conduct investigations, its investigation into Atkison's application of the pesticide is within the exception in Rule 803(8). However, this argument ignores the rest of the rule which provides that special investigations of

particular complaints, cases, or incidents are not within the exception. *Swart, supra.* Because several complaints were made against Atkison, the Plant Board conducted a hearing. Thus, the hearing before the Plant Board was a special investigation of a particular complaint, case, or incident under Rule 803(8)(iv).

This distinction may be illustrated by the example of a public agency charged with monitoring water quality in the state's rivers. If the agency, in fulfillment of its routine duties, tests the water in a flooding river (*i.e.*, resulting from a particular incident, namely, the flood), the factual findings of those tests would be admissible in a civil trial as within the public records or reports exception to the hearsay rule. If, however, the agency conducts an investigation in response to a complaint that someone is dumping material into a river, the factual results of that investigative report would be inadmissible pursuant to Rule 803(8)(iv). *See Daniels v. Tew Mac Aero Servs., Inc.*, 675 A.2d 984 (Me. 1996).

■■ The preceding illustration highlights one of the primary underpinnings of the Rule 803(8) exception, namely, the assumption that *routine* reports by public officials in their official duties will be prepared properly. *Daniels, supra* (discussing the advisers' note to identical Maine R. Evid. 803(8)). That assumption may be suspect when a public official prepares a *special* report in response to a particular complaint, case, or incident as opposed to merely carrying out routine duties. There may be a greater likelihood that a *special* report will be influenced by persons interested in the outcome. This is true where the complaining party is not presented an opportunity to be heard at the administrative hearing. The 803(8)(iv) exception guards against the risk of people using public agency investigations as a litigation tool by banning as evidence at the trial the factual findings contained in *special* reports that result from particular complaints, cases, or incidents. *Daniels, supra.* Another reason supporting the conclusion that the Board's report is not within the Rule 803 exceptions is that where the drafters wished to make judicially-found facts admissible, they did so expressly. *See* Ark. R. Evid. 803(22) (pertaining to judgments of previous conviction) and Ark. R. Evid 803(23) (pertain-

ing to judgments as to personal, family, or general history, or boundaries).

For its second point on appeal, McCorkle Farms argues that the trial court erred in failing to instruct the jury that violation of a Plant Board regulation concerning the use of the pesticide 2,4-D was evidence of negligence. A Plant Board regulation prescribes the conditions under which 2,4-D can be applied and prohibits a landowner from permitting 2, 4-D to be applied to his crop under conditions contrary to the regulation. McCorkle Farms' theory at trial was that Thompson allowed Atkison to apply the 2,4-D under conditions outside the regulations and, therefore, Thompson was responsible for the damage to its crop.[2] As part of its case, McCorkle Farms introduced the Plant Board regulations concerning the use of the pesticide and Thompson objected, stating that it was improper to introduce the regulations into evidence. The trial court then noted that McCorkle Farms had the option of either introducing the regulations into evidence or of having the jury instructed that violation of the regulations was evidence of negligence. McCorkle Farms sought to do both and proffered its requested instruction D, based on AMI Civil 4th 601 and AMI Civil 4th 903. The trial court did not state any reason for the denial of the requested instruction at the time the instruction was offered.

 The Arkansas Supreme Court has emphasized that, when an AMI instruction is applicable in a case, it shall be used unless the trial judge finds that it does not accurately state the law and, in the event it is not used, the trial judge is required to state his reasons for refusal. *See, e.g., Taylor v. Riddell,* 320 Ark. 394, 896 S.W.2d 891 (1995); *Boyd v. Reddick,* 264 Ark. 671, 573 S.W.2d 634 (1978); *Southeast Constr. Co. v. Eudy,* 252 Ark. 649, 480 S.W.2d 571 (1972). This court, in *Williams v. Arkansas State Highway Commission,* 21 Ark. App. 98, 730 S.W.2d 245 (1987), stated that a litigant is entitled to have his theory of the case sub-

---

[2] *See McGraw v. Weeks,* 326 Ark. 285, 930 S.W.2d 365 (1996) (holding, in a case involving 2,4-D, that when it can be shown that an individual employed by a corporation is personally involved in the events surrounding an injury, the individual may be sued).

mitted to the jury. It is the obligation of a trial judge to instruct the jury upon the law of the case with clarity and in such a manner as to leave no basis for misrepresentation or mistake. *McCrory v. Johnson*, 296 Ark. 231, 755 S.W.2d 566 (1988); *W.M. Bashlin Co. v. Smith*, 277 Ark. 406, 643 S.W.2d 526 (1982). As stated in *Holiday Inns, Inc. v. Drew*, 276 Ark. 390, 396, 635 S.W.2d 252, 256 (1982) (quoting *Beevers v. Miller*, 242 Ark. 541, 414 S.W.2d 603 (1967)):

> Even if the court's general instructions could be said technically to have covered the matter in a general way, it is error to refuse to give a specific instruction correctly and clearly applying the law to the facts of the case, even though the law in a general way is covered by the charge given unless it appears that prejudice has not resulted.

 The instructions do not tell the jury that Thompson's violation of the regulations is evidence of negligence on his part. This court, in *J.L. Wilson Farms, Inc. v. Wallace*, 267 Ark. 643, 590 S.W.2d 42 (Ark. App. 1979), held that the 2,4-D regulations were a proper consideration of the jury in determining the question of negligence. By having the regulations in evidence without an instruction on those regulations, the jury very well may have been misled or confused by the instructions because the jury might not have understood the significance of the regulations. The proffered instruction correctly and clearly applied the law to the facts of the case. Therefore, the trial judge erred by not giving this proffered instruction.

In its third point, McCorkle Farms makes another argument concerning the trial judge's failure to instruct the jury. McCorkle Farms requested an instruction, proffered instruction C, based on AMI Civil 4th 708, that a party who hires an independent contractor to perform work involving an inherently dangerous instrumentality is liable for the negligence of the independent contractor. The requested instruction was also refused without explanation.

The Supreme Court of Arkansas has held that the spreading of 2,4-D by air is unduly hazardous to nearby crops. *Chapman Chem. Co. v. Taylor*, 215 Ark. 630, 222 S.W.2d 820 (1949). *See also Little v. McGraw*, 250 Ark. 766, 467 S.W.2d 163 (1971). The court has also held that, because of the propensities of 2,4-D to produce injury or damage to the property of others, a person making use of such substances cannot escape liability for such injury or damage by employing an independent contractor to make the actual application. *Southwestern Bell Tel. Co. v. Smith*, 220 Ark. 223, 247 S.W.2d 16 (1952); *Heeb v. Prysock*, 219 Ark. 899, 245 S.W.2d 577 (1952); *McKennon v. Jones*, 219 Ark. 671, 244 S.W.2d 138 (1951); *Hammond Ranch Corp. v. Dodson*, 199 Ark. 846, 136 S.W.2d 484 (1940).

In *McKennon v. Jones, supra*, a pesticide spray was used and resulted in the killing of honey bees and the destruction of honey. The supreme court said:

> While it is true that as a general rule, the employer would not be liable for the negligence of an independent contractor, there are exceptions to this rule. One exception is that where the work to be performed is inherently dangerous, as here, the employer will not be permitted to escape liability for negligent injury to the property of another, by an employee, to whom the employer has delegated, or contracted, the performance of the work.

*Id.* at 673, 244 S.W.2d at 140. *See also Hammond Ranch Corp. v. Dodson, supra*; *Kennedy v. Clayton*, 216 Ark. 851, 227 S. W. 2d 934 (1950). When Thompson delegated the spraying of his premises to Atkison, whether as an employee or independent contractor, he assumed full responsibility for Atkison's acts. The requested instruction is a proper statement of the law under our cases and based on an AMI instruction. As such, a reversal must follow the refusal of a proper instruction. *Holiday Inns, supra*.

For its fourth and final point, McCorkle Farms argues that the trial court erred in allowing Thompson to introduce statistical evidence of average per-acre yields for a ten-year period in support of his contention that McCorkle Farms did not suffer a reduction in its yield as a result of 2,4-D exposure. During open-

ing statement and again during his case-in-chief, Thompson referred to evidence from the Extension Service as to the average cotton crop yields in Cross County for a ten-year period. McCorkle Farms objected on relevancy grounds, arguing that there must be a showing of comparable conditions in order for the yield averages to be admissible. The trial judge overruled the objection, and the documents were introduced. Thompson then testified as to the prior-year averages, which showed the average yield for irrigated crops ranged from 400 pounds per acre to 672 pounds per acre.

The measure of damages to the crops is the value of the difference between what was actually produced and what would have otherwise been produced, less the difference between the cost of producing and gathering what was produced and the cost of producing and gathering an undamaged crop. *Heeb v. Prysock, supra; St. Louis Southwestern Ry. v. Ellis*, 169 Ark. 682, 276 S.W. 996 (1925); AMI Civil 4th 2226. This court, in *J.L. Wilson Farms, Inc. v. Wallace*, 267 Ark. 643, 590 S.W.2d 42 (Ark. App. 1979), held that evidence as to the average yield per acre for the prior years is not reliable in computing damages in light of weather conditions and other factors that vary annually. However, *Wallace* also held that a comparison between the yield from the damaged land and the yield from adjacent but undamaged land during the same season, for the same crop, was substantial evidence to support an award of damages. The admission of the average-yield reports was error because there was no showing of comparability to appellant's lands and growing conditions, as required by *Wallace*. Without the showing of comparability, the yield averages could mislead the jury and would have little independent relevance.

Reversed and remanded.

PITTMAN and GRIFFEN, JJ., agree.